**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**


| | |
|---|---|
| **BLACK BEAR SPORTS GROUP, INC** ) | |
| **and CENTER ICE ARENA, LLC,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Case No. 18 C 8364** |
| ) | |
| **AMATEUR HOCKEY ASSOCIATION OF** ) | |
| **ILLINOIS, INC.,** ) | |
| ) | |
| **Defendant.** ) | |


## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Black Bear Sports Group, Inc. and its subsidiary Center Ice Arena, LLC sued the

Amateur Hockey Association of Illinois alleging violations of federal and state antitrust

law as well as a state-law claim for tortious interference with prospective business

relations. The Association has moved to dismiss for lack of standing and for failure to

state a claim upon which relief can be granted. For the reasons described below, the

Court grants the motion to dismiss.

## Background

For the purposes of this motion, the Court presumes the truth of the facts alleged

in the plaintiffs' complaint. Black Bear and Center Ice, to which the Court will generally

refer collectively as Black Bear unless the distinction is relevant, operate ice rinks.

Black Bear operates ten rinks across the United States. Four of those rinks are in the

Chicago suburbs of Glen Ellyn, Woodridge, Lincolnwood, and Crestwood. Black Bear

purchased these four rinks between 2016 and 2018 as part of its strategy of acquiring "undermanaged and underperforming" facilities and investing in capital improvements and professional management in order to create successful businesses. Compl., dkt. no. 1, ¶ 37. Black Bear also manages youth and junior hockey teams. Specifically, it manages teams affiliated with facilities it operates in New Jersey, Ohio, and Maryland. Black Bear's profit model relies on ice rental income from amateur hockey and figure skating, admission fees for public skating at its facilities, and amateur hockey club participation fees.

A brief primer on the structure of youth hockey is necessary. As a matter of federal statute, amateur sports in which the United States competes internationally are subject to a hierarchical regulatory scheme. *See* Amateur Sports Act, 36 U.S.C. §§ 220501, 220503. Amateur hockey is regulated by USA Hockey, Inc., which in turn sanctions state and regional affiliates. Since 1975 the Amateur Hockey Association of Illinois has been the affiliate regulator of amateur hockey in the state of Illinois.

The Association organizes amateur hockey by age and skill level. "Youth hockey" includes individuals under the age of 18. Youth players and teams are categorized on three tiers: Tier I teams are made up of the highest-skilled players and travel throughout the United States and Canada to compete with other elite teams; Tier II is intended for competitive but somewhat less skilled players who want to engage in regional competition; and Tier III is made up of beginners and recreational teams. According to the complaint, Tier II teams affiliated with the Association compete in either the Northern Illinois Hockey League or the Central States Developmental Hockey League, with the latter reserved for the most skilled Tier II players.

All youth hockey teams in Illinois are required to affiliate with the Association. Likewise, all participating teams are required to follow the Association's by-laws and rules and regulations. Those teams or players who do not comply with the Association's regulations or who participate in games with teams that are not registered with the Association or another USA Hockey-sanctioned governing body may face discipline, including loss of eligibility to participate in Association-sponsored tournaments, loss of insurance coverage, and revocation of membership.

Youth hockey is booming in Illinois. Nationally, participation has increased by nearly nine percent since 2013. The growth rate in Illinois has more than doubled that number, with a more than eighteen percent surge in participation during the same period. There are nearly fifty Tier II hockey clubs in what the plaintiffs describe as the "Northern Illinois region," each of which has between ten and thirty teams.[1] Each of these youth hockey clubs has a facility designated as its "home ice."

Black Bear wants the Association to grant it a charter to sponsor a Tier II club that would have its home ice at its Center Ice facility in Glen Ellyn, Illinois. Black Bear's rinks in Woodridge, Lincolnwood, and Crestwood already host Association-affiliated clubs.[2] But its Center Ice facility is underused. The facility has robust learn-to-skate and learn-to-play hockey programs. It does not, however, have a youth hockey club that calls the facility home. Black Bear says that it has "approached [the Association] about obtaining approval for a new Tier II club." Compl., dkt. no. 1, ¶ 53. But,

---

[1] The plaintiffs also allege certain facts regarding participation levels in Tier I teams. Those allegations are not directly relevant to this motion because, as discussed below, Black Bear hopes to get a charter to organize a Tier II club.

[2] Importantly, Black Bear does not sponsor these three teams but rather simply provides them its ice rink facilities.

according to Black Bear, the Association has moved to dash its hopes by "enact[ing] rules and . . . taking other actions to prevent [it] from entry into the relevant market." *Id.* ¶ 58. Specifically, it says that the Association "has told Black Bear that a Tier II club at Center Ice of DuPage is unnecessary and that there are already enough teams in the relevant market." *Id.* ¶ 59. Black Bear also alleges that someone—it does not say who—"told [Black Bear] that it cannot start a new Tier II club because it is a for-profit enterprise and [Association] rules require sponsors to be charitable organizations." *Id.* ¶ 61. According to Black Bear, these allegations, combined with the Association's reluctance to provide Black Bear with a copy of the application for a Tier II club charter, *id.* ¶ 65, amount to a predetermination by the Association that it will not grant a charter to Black Bear.

But Black Bear does not allege that its application has been rejected or even that it has actually applied for a Tier II club charter. Nor does Black Bear allege that the Association or relevant decisionmakers have told it, in so many words, that such an application would be rejected. Rather, Black Bear points to three "requirements" outlined in a publicly available Association document that it says preclude it from getting a charter. First, it points to the Association's requirement that member "club[s] must not be associated with a 'for-profit' organization . . . in accordance with [Association] Rules and Regulations Article 19[] and [the] USA Hockey Affiliate Agreement." Tier 2 Application Requirements, Ex. 2 to Compl., dkt. no. 1-2, ¶ 7. Black Bear also alleges that the Association's requirements that applicants identify any other youth hockey programs that granting a new charter application would affect, *id.* ¶ 13, and list any players and programs with which they were affiliated in the five years preceding their

application, *id.* ¶¶ 5-6, "demonstrate" that that any attempt by Black Bear to get a Tier II club charter is hopeless, Compl. ¶¶ 67, 68.  In Black Bear's view, these regulations preclude any application it might submit from succeeding, harm competition in the relevant market, and cause it injury.

Black Bear also alleges it has been injured by another rule recently adopted by the Association.  Specifically, Black Bear says that it arranged for the Association-affiliated Tier II club that uses its Lincolnwood rink as its home ice to retain the Center Ice facility in Glen Ellyn as "additional ice," for which the team would have paid Black Bear rental fees.  But, Black Bear alleges, "upon learning that the [team] intended to use the Center Ice Facility, [the Association] promulgated a new by-law (1.2.5) that prevents a Tier II team from using ice facilities more than fifteen miles from its home rink."[3] *Id.* ¶ 72.  In Black Bear's view, this rule further demonstrates the Association's intent to maintain its monopoly power and to injure Black Bear.

Black Bear filed a four-court complaint.  Count 1 alleges monopolization under section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2; count 2 alleges a violation of the corresponding state law provision, 740 Ill. Comp. Stat. 10/3(3); and count 3 alleges Illinois common-law tortious interference with prospective business relations.  Count 4 purports to plead a separate request for injunctive relief based on the first two counts.

The Association has filed a motion to dismiss Black Bear's complaint.

### Discussion

To survive a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1)

---

[3] Black Bear's citation is not quite correct.  It is not by-law 1.2.5 but rather paragraph 1.2.5 of the Association's rules and regulations that sets out the relevant additional ice limitation.

and 12(b)(6), a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For a claim to be plausible on its face, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* It must provide more than "labels and conclusions or a formulaic recitation of the elements of a cause of action . . . ." *Id.* (internal quotation marks omitted). The Court is "not obliged to accept as true legal conclusions or unsupported conclusions of fact." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 66, 633 (7th Cir. 2007) (internal quotation marks omitted).

Typically, a court's assessment of a motion to dismiss must be made on the complaint alone. *See Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). But where, as in this case, significant documents are referenced in the complaint and attached by the defendant to its motion to dismiss, those documents are considered to be incorporated into the pleadings and a court may consider them. *See id.*; *see also Orgone Capital III, LLC v. Daubenspeck*, 912 F.3d 1039, 1044 (7th Cir. 2019) ("We may also . . . consider documents incorporated by reference in the pleadings."); *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice."). And, indeed, "[t]he court is not bound to accept the pleader's allegations as to the effect of the [documents], but can independently examine [them] and form its own conclusions as to the proper

construction and meaning to be given the material." *Rosenblum*, 299 F.3d at 661. In this case, the Association's by-laws, rules and regulations, and "Tier 2 Application Requirements" document—all of which were attached as exhibits to the complaint or the motion or both—are appropriately before the Court to the extent that they "are critical to the complaint and referred to in it." *Reed*, 905 F.3d at 548.

The Association's motion to dismiss rests principally on its contention that Article III standing is lacking. "The jurisdiction of federal courts is limited by Article III of the Constitution to 'Cases' and 'Controversies.'" *Freedom from Religion Found., Inc. v. Lew*, 773 F.3d 815, 819 (7th Cir. 2014) (quoting U.S. Const. art. III, § 2.). The Supreme Court has explained that "the irreducible constitutional minimum of standing consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* At the pleading stage, the plaintiff "must clearly allege facts demonstrating" each element. *Id.* (internal quotation marks and alteration omitted).

The Association disputes whether Black Bear has suffered an injury in fact. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "When an injury is threatened in the future, the risk of harm must be substantial and more than speculative." *Otrompke v. Hill*, 592 F. App'x 495, 498 (7th Cir. 2014); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Freedom from Religion Found.*, 773 F.3d at 821-22, 824-25.

Black Bear alleges two types of injury.  First, it alleges that it has effectively been denied a Tier II club charter by the Association due to the Association's purported requirement that clubs be non-profit organizations.  The Court will refer to this as the alleged exclusion injury.  Second, Black Bear alleges that it has been injured by the Association's adoption of the additional ice rule in early 2018.  The Court addresses each in turn.

## A.    Exclusion injury

Black Bear's first and primary argument rests on its alleged exclusion by the Association from youth hockey.  Specifically, it alleges that the Association has adopted policies that effectively shut the door to any application Black Bear might make for a youth hockey club charter.  Black Bear dedicates most of its argument to the Association's purported requirement that youth hockey "club[s] must not be associated with a 'for-profit' organization."  Tier 2 Application Requirements, Ex. 2 to Compl., dkt. no. 1-2, ¶ 7.  Black Bear, as a for-profit company, says that this exclusion effectively bars it from receiving a charter—and, indeed, that it so clearly precludes it that any application would be futile and thus unnecessary to establish an injury that is sufficiently concrete and imminent to satisfy Article III's standing requirements.

Because this allegation rests on the interpretation of key documents, the Court undertakes an independent assessment of those documents.  *See Rosenblum*, 299 F.3d at 661.  The clearest flaw in the interpretation underlying Black Bear's argument is that it seeks to read the short informational sheet the Association provides prospective applicants in isolation.  Critically, however, the document incorporates Association "Rules and Regulations Article 19[] and [the] USA Hockey Affiliate Agreement."  Tier 2

Application Requirements, Ex. 2 to Compl., dkt. no. 1-2, ¶ 7.  One relevant portion of Article 19 indeed states that "[e]xcept as set out in the [Association] By-Laws, Rules and Regulations, each Affiliate shall have a corporate structure and at all times maintain a tax exempt status under Section 501(c)(3) of the Internal Revenue Code . . . ." Association Rules & Regs., Ex. 2 to Mot. to Dismiss, dkt. no. 20-3, § 19.7.2.  But Article 19 then sets out exceptions to this general rule for (1) affiliates associated with for-profit learn-to-skate programs or "house league affiliates" and (2) affiliates that operate a for-profit rink owned by the affiliate.  *Id.* § 19.7.3.  Black Bear, as described above, operates multiple for-profit ice rinks and learn-to-skate programs, including at the Center Ice facility where it hopes to organize a new Tier II youth club.  Without determining whether these exceptions are necessarily applicable in this situation, the Court observes that they create significant uncertainty about whether the non-profit rule actually would bar Black Bear's application for a club charter.

In addition to Article 19's exceptions, the defendant also points out that the relevant by-law governing applications for Tier II club charters gives the reviewing Association committee nearly boundless discretion.  Specifically, by-law 8.3.4 sets out that, when faced with a request for Tier II membership, "[t]he Tier II Committee may deny the request, postpone consideration of the request, grant probationary status as a Tier II Member Association, grant full status as a Tier II Member Association, or take any other action that it determines to be in the best interest of hockey in Illinois." Association By-Laws, Ex. 1 to Mot. to Dismiss, dkt. no. 20-2, § 8.3.4.  This broad discretion suggests that neither the non-profit rule nor the other application "requirements" alleged by Black Bear—that the applicant must identify clubs that would

be affected by the grant of a new club charter and list any athletes and programs with which it has previously affiliated—might not doom its application.

Taken together, these provisions of the governing documents render Black Bear's allegations of injury too speculative to confer Article III standing.  *Cf. Otrompke*, 592 F. App'x at 498 (concluding standing was lacking where a plaintiff sought to challenge bar admission criteria but failed to apply for membership).  As noted previously, Black Bear has not alleged that the Association or relevant decisionmakers have unequivocally stated that the Association would reject an application by Black Bear for a Tier II club charter.  It has alleged, in relevant part, only that the "Association has told Black Bear that a Tier II club at Center Ice of DuPage is unnecessary," Compl., dkt. no. 1, ¶ 59, and that someone "told [Black Bear] that it cannot start a new Tier II club because it is a for-profit enterprise," *id.* ¶ 61.  Even taking these allegations as true, it is not reasonable to infer—particularly in light of the questions raised by the controlling rules and by-laws—that it is a foregone conclusion that an application would be denied. Black Bear's alleged injury is thus too conjectural to support the injury-in-fact requirement for constitutional standing.

The bottom line is that, on the present allegations, Black Bear cannot proceed with this lawsuit without having actually applied for a Tier II club charter.  But, contrary to the Association's contention, Black Bear likely would not need to exhaust the appeals provided for in the Association's rules if it did apply and was rejected.  *See generally* Association Rules & Regs., Ex. 2 to Mot. to Dismiss, dkt. no. 20-3, art. 10. (describing appeals procedures).  The language of the rule that sets out the appeals process is precatory; it states that "[a]ppeals of any [Association] Committee decision . . . *may* be

made" to the Association board of directors.  *Id.* (emphasis added).  Nor does it appear that Black Bear would have to pursue the arbitration process outlined in the Association's by-laws.  The by-law on dispute resolution applies only to "person[s] and entit[ies] within the jurisdiction of [the Association] . . . by virtue of their membership, affiliation or participation, at any time, in an [Association] program or sponsored event."  Association By-Laws, Ex. 2 to Mot. to Dismiss, dkt. no. 20-2, § 14.0.2.  If the Association were to deny Black Bear's application for a Tier II club charter—as Black Bear contends is inevitable—then Black Bear likely would not be within the Association's jurisdiction as defined by its own arbitration by-law.  The defendant's arguments about mandatory appeals and arbitration therefore appear, at least at this stage, to lack merit.

**B.  Additional ice injury**

Black Bear's other alleged injury arises from the additional ice rule.  Specifically, Black Bear alleges that it has lost rental fees it otherwise would have garnered from renting its Center Ice facility in Glen Ellyn as additional ice for a team that has its home ice at Black Bear's Lincolnwood facility.  It alleges that this loss was caused by the Association's adoption in early 2018 of a rule that, in Black Bear's characterization, "prevents a Tier II team from using ice facilities more than fifteen miles from its home rink."  Compl., dkt. no. 1, ¶ 72.  Black Bear alleges that the adoption of this rule "demonstrates [the Association]'s intent to main its monopoly power and to injure Black Bear."  *Id.* ¶ 73.

Again, however, the Court is not obliged to take Black Bear's interpretation of the Association by-law at face value.  *See Rosenblum*, 299 F.3d at 661.  And in fact Black

Bear's characterization of the additional ice rule is significantly incomplete. Contrary to Black Bear's allegation, the rule does not categorically "prevent" Tier II teams from using additional ice at facilities more than fifteen miles from their home rink. Rather, it states that rinks within fifteen miles may be used without any prior approval but "[r]inks outside the designated area must be approved by the" relevant Association committee. Association Rules & Regs., Ex. 2 to Mot. to Dismiss, dkt. no. 20-3, § 1.2.5.

As with the exclusion injury discussed above, Black Bear has alleged neither that it applied for approval of its additional ice arrangement nor that such an application was rejected. Nor does it allege that the Association or any relevant decisionmaker has even so much as suggested that such an application would be rejected or would be a waste of time.[4] Even assuming that Black Bear's allegations regarding this injury provide more than the sort of "labels and conclusions" regularly deemed insufficient to survive a motion to dismiss for failure to state a claim, *see Twombly*, 550 U.S. at 570, the additional ice allegation runs afoul of the injury-in-fact requirement for many of same reasons as the exclusion injury, *see Otrompke*, 592 F. App'x at 498. That is, taking Black Bear's allegations as true, it has not "clearly allege[d] facts demonstrating" that it suffered an injury in fact from the Association's adoption of the additional ice rule. *Spokeo*, 136 S. Ct. at 1547.

---

[4] The Court also notes that Black Bear has apparently not attempted to allege, as the Seventh Circuit has suggested may be sufficient, that the additional ice rule imposes an "additional burden" unique to particular group of plaintiffs sufficient to satisfy the injury-in-fact requirement. *See Freedom from Religion Found.*, 773 F.3d at 825. That said, it is not clear to the Court that such an allegation would be sufficient to confer standing under that and subsequent cases. *See id.*; *see also Spokeo*, 136 S. Ct. at 1548 (noting that concreteness is a separate requirement distinct from particularity and that the latter does not satisfy the former).

**Conclusion**

For the foregoing reasons, the Court grants the defendant's motion to dismiss [dkt. no. 18] and directs the Clerk to enter judgment dismissing the case for lack of standing.  The status hearing and ruling set for May 14, 2019 is vacated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  May 9, 2019